IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Thierry Roullier and Cyraina Roullier, on behalf of all others similarly situated | ) ) ) ) | |
| Plaintiffs, | | |
| v. | ) ) ) | No. 26 C 632 |
| Cenlar, FSB and Citimortgage, Inc., | ) ) ) | |
| Defendants. | ) | |

Memorandum Opinion and Order

After a years-long struggle to have a mortgage servicing company rectify a cascade of errors in the processing and accounting of their mortgage payments – errors that caused them to incur various expenses and suffer financial losses in response to repeated threats of foreclosure – plaintiffs Thierry and Cyraina Roullier sued the servicer (defendant Cenlar) and the lender (defendant Citimortgage, or "Citi") for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") and common law negligence. Plaintiffs' complaint, which was filed in state court on October 22, 2025, and later removed here, asserts both of these claims on behalf of a putative class. In separate motions, defendants seek dismissal of both claims under Fed. R.

Civ. P. 12(b)(6).[1] For the following reasons, Cenlar's motion to dismiss is denied, and Citi's motion is granted.

I.

Plaintiffs allege that their issues with Cenlar began in 2019, when Citi "hired" Cenlar to service the mortgage loan and Home Equity Line of Credit ("HELOC") that plaintiff had taken out with Citi. Compl., ECF 1-2 at ¶¶ 15-17. Despite being told that the automatic payments plaintiffs made on their HELOC would "transfer automatically" to Cenlar, Mrs. Roullier began "receiving strange letters from Cenlar about payment issues." *Id.* at ¶ 18. In or around the first quarter of 2020, Cenlar reported plaintiffs' payment as 60 days late. *Id.* at ¶ 20. Plaintiffs were able to bring their accounts current, but "the damage to their credit reports had been done." *Id.* at ¶ 22.

In the fall of 2020, Cenlar "imposed an escrow account" then suddenly raised the monthly mortgage payment by $2500—an amount plaintiffs could not pay at the height of the Covid pandemic, which had affected their finances. Id. at ¶¶ 23-24. Accordingly, plaintiffs requested and received a Covid forbearance, expecting to defer any accrued balance to the end of their loan. But when plaintiffs tried to exit forbearance and resume payments, they found themselves unable to do so: Mrs. Roullier placed call after

---

[1] Cenlar also filed a motion to strike plaintiffs' class allegations, which I grant as unopposed.

call, requesting to get out of forbearance, but each time to a different person who had no record of her previous requests or informed her that previous requests "had not gone through." So each time, she made a new request and was told to wait. *Id*. at ¶¶ 30-36.

Throughout this period, Cenlar failed to explain the complicated rules for terminating forbearance, leaving plaintiffs with fewer and fewer options until deferral was no longer a possibility. Instead, Cenlar tried to pressure plaintiffs into accepting a loan modification, sending them "a huge volume of mailings," including unsolicited applications for loan modifications. *Id*. at ¶¶ 25-29. Finally, Cenlar demanded payment of the entire amount that had accrued during the forbearance period—approximately $75,000—or risk foreclosure. To avoid losing their home, plaintiff withdrew $75,000 from a retirement account. *Id*. at ¶¶ 38-39. Although Cenlar ultimately approved plaintiff in June of 2022 for a payment deferral, *id.* at ¶ 42 and Exh. A (06/08/2022 letter confirming approval of deferral), the withdrawal caused them to incur a tax liability of approximately $50,000 and to forego the interest they would have earned on the retirement funds had they remained invested. *Id*. at ¶¶ 62-64.

Moreover, the deferral agreement did not resolve plaintiffs' issues with Cenlar. Despite making monthly payments pursuant to the terms of their deferral agreement, in October of 2022 and

December of 2022, Cenlar sent plaintiffs notices informing them that their mortgage was in default. These letters threatened to demand accelerated payment of all outstanding amounts and the foreclosure and sale of their home. *See* Exh. Compl. at ¶¶ 44, 50 at Exhs. B, D. Plaintiffs had records proving payments of the supposedly delinquent payments, which they attempted to provide Cenlar in an effort to resolve these issues, but Cenlar merely sent Mrs. Roullier from department to department, with no one willing or able to correct the payment errors. *Id*. at ¶¶ 46-48. Meanwhile, Cenlar continued to damage plaintiffs' credit by falsely reporting their payments as delinquent. *Id*. at ¶ 49.

Cenlar's erroneous accounting had repercussions for plaintiffs' escrow account, too. In an Annual Escrow Account Disclosure Statement dated 10/12/2022, Cenlar informed plaintiffs that their escrow account had a surplus of over $4,000, which "must be returned" to them. Exh. E. Nevertheless, the Statement advised them that "[d]ue to the delinquent status of your account, however, we will retain your surplus." *Id*. Plaintiffs' account was not in default, however, as Mrs. Roullier had been making the monthly payments designated in the June 2022 deferral letter. Indeed, to be sure that plaintiffs paid the correct amount required by the deferral agreement, and because "all the numbers in their online account were wrong," Mrs. Roullier had to make payments over the phone, for which she incurred additional fees. Sometimes, Mrs.

4

Roullier had to call back several times because the agents refused to accept her payment, claiming that they were unable to take "partial" payments. Then, Cenlar automatically deducted two payments for the month March of 2023, falsely asserting that plaintiffs had authorized both payments by phone. Amidst all of this, Cenlar continued to treat plaintiffs' account as in default. *Id*. at ¶¶ 51-55.

Cenlar finally managed to correct these errors in January of 2024, but not before plaintiffs suffered financial losses, including those noted above. Additionally, as a result of Cenlar's erroneous negative credit reporting, plaintiffs were unable to refinance their loan—which has an adjustable interest rate that has been increasing by 2% each year—as they had hoped to do when interest rates were much lower. Cenlar's conduct has also had a profound effect on the Roulliers' mental and physical health, causing damage to personal relationships and work performance. Both plaintiffs experienced sleepless nights and feelings of hopelessness.

## II. Cenlar's motion to dismiss

Cenlar's lead argument for dismissal of plaintiffs' ICFA claim is that its "unresponsive, misleading, or error-riddled mortgage servicing" is not actionable under the ICFA, as a matter of law, citing several cases from this district in support of this view. *See* Mot. ECF 11 at 7-8 (quoting and/or citing *Williams v.*

*Cenlar FSB*, No. 21-CV-03271, 2024 WL 3694477, at *13 (N.D. Ill. Aug. 7, 2024) (Kness, J.); *Gritters v. Ocwen Loan Servicing, LLC*, No. 14-CV-916, 2018 WL 1784134, at *14 (N.D. Ill. Apr. 13, 2018) (Alonso, J.) (summary judgment); *Geske v. Fed. Nat'l Mortg. Ass'n*, No. 13-CV-7720, 2015 WL 1397087, at *5 (N.D. Ill. Mar. 25, 2015) (Dow, J.); and *Golbeck v. Johnson Blumberg & Assocs.*, LLC, No. 16-CV-6788, 2017 WL 3070868, at *13 (N.D. Ill. July 19, 2017) (Dow, J.). I have reviewed each of these decisions, which dismissed or granted summary judgment of ICFA claims that the courts deemed to be merely repackaged or disguised breach of contract claims. To the extent the analysis in these cases could be deemed to apply here, I respectfully disagree that the conduct plaintiffs alleged, as a matter of law, satisfy the "unfairness" prong of ICFA.[2]

"ICFA is a mandate to provide consumers with the greatest possible relief." *Newman v. Metro.* Life *Ins. Co.*, 885 F.3d 992, 1000 (7th Cir. 2018). "To show that something is an unfair practice under the CFA, the practice must offend public policy; be immoral, unethical, oppressive, or unscrupulous; or cause substantial injury to consumers." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 665 (7th Cir. 2008) (internal quotation marks and citation

---

[2] Because plaintiffs' claim relies on ICFA's unfairness prong, it must satisfy only the "notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b)." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008).

omitted). Not all three criteria need to be met. "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 961 (Ill. 2002) (citation omitted). Conduct is immoral, unethical, oppressive, or unscrupulous under ICFA if it "leave[s] the consumer with little choice except to submit to it." *Newman*, 885 F.3d at 1002-03; *see also Robinson*, 775 N.E.2d at 962 (holding that oppression requires a "lack of meaningful choice" for consumers). Here, plaintiffs allege that Cenlar trapped them into a forbearance agreement they were unable to terminate, then demanded immediate payment of the full that had accrued during the forbearance period to avoid foreclosure, which Cenlar ultimately agreed to defer, but not before plaintiffs incurred substantial losses to satisfy the demand; transferred funds out of plaintiffs' account without authorization; and failed to acknowledge payments plaintiffs had proof of having made, then withheld the return of escrow funds Cenlar acknowledged "must be returned" on the basis that plaintiffs were in putative default for failing to make those payments. These allegations, taken together, adequately suggest unfair conduct in handling plaintiffs' mortgage loan.

Cenlar offers two additional arguments for dismissal: that most of the conduct plaintiffs allege occurred outside ICFA's three-year limitations window, and that the "preexisting duty"

rule bars recovery for the tax liability and other losses plaintiffs allege in connection with the $75,000 withdrawal from their retirement fund. Neither argument warrants dismissal at the pleading stage. On the first issue, plaintiffs acknowledge that a portion of the conduct they attribute to Cenlar is outside the limitations period and explain that they include allegations about that conduct for context. At least some of Cenlar's allegedly unfair conduct, however—including sending an erroneous default notice threatening acceleration of plaintiffs' balance and foreclosure and sale of their home in December of 2022; refusing to accept certain payments Mrs. Roullier tried to make by phone to ensure that plaintiffs' account remained current, and charging fees for phone payments that plaintiffs were unable to pay by other means as a result of Cenlar's errors; failing to return escrow funds that Cenlar acknowledged "must be returned," due to Cenlar's failure to credit payments plaintiffs actually made; and debiting unauthorized amounts from plaintiffs' bank account—were within the statutory time frame. Accordingly, it is not clear from the face of the complaint that Cenlar prevails, as a matter of law, on the affirmative defense of untimeliness.

Nor does the "preexisting duty" rule compel dismissal. Cenlar does not contend that *all* of plaintiffs' alleged losses are barred by this rule; it argues more narrowly that plaintiffs cannot recover for losses flowing from their withdrawal of retirement

8

funds because they were contractually obligated to pay the $75,000 debt they expected to pay off with those funds in any event, and "completion of a pre-existing legal duty does not constitute damages." *Milam v. Selene Fin., LP*, No. 24 C 317, 2024 WL 3455027, at *6 (N.D. Ill. July 18, 2024). Indeed, plaintiffs acknowledge in their response that the $75,000 debt was "rightfully due"; but they also point to additional losses in the form of excess fees and unauthorized debits from their bank account that go beyond amounts they otherwise owed. While plaintiffs ultimately may not be entitled to recover for every economic loss they identify in their complaint, the preexisting duty rule is not fatal to their ICFA claim.

Turning to plaintiffs' common law negligence claim, Cenlar argues that this claim is defective because it is explicitly premised on Cenlar's alleged breach of the requirements of RESPA and one of its implementing regulations, Regulation X, which do not create any duty of care under Illinois common law. It is true that plaintiffs identify RESPA and Regulation X as one source of Cenlar's duty of care to customers whose loans it services, but they also alleged that Cenlar breached "a general duty to maintain data related to a borrower's mortgage loan in an accurate and reasonable manner, especially with respect to a homeowner's escrow accounts." Compl. at ¶ 103. Cenlar does not dispute that "Illinois law holds that an escrow agent has a fiduciary duty to the party

9

making the deposit and the party for whose benefit the deposit is made," *Fed. Deposit Ins. Corp. v. Chicago Title Ins. Co.*, No. 12-CV-05198, 2016 WL 7339150, at *6 (N.D. Ill. Dec. 19, 2016) (citation, internal quotation marks, and alteration omitted). Indeed, it acknowledges that in cases such as *Choi v. Chase Manhattan Mortgage Co.*, 63 F. Supp. 2d 874, 885 (N.D. Ill. 1999), *Ploog v. HomeSide Lending, Inc.,* 209 F. Supp. 2d 863, 874-75 (N.D. Ill. 2002), and *Reda v. Nationstar Mortg., ILC*, No. 20-CV-2010, 2020 WL 7353410, at *3 (N.D. Ill. Dec. 15, 2020), courts have held that "mismanagement of an escrow may give rise to a cause of action for a breach of fiduciary duty." *Choi*, 63 F. Supp. 2d at 885. Cenlar faults plaintiffs for not explicitly alleging that it owed them a "fiduciary" duty. But Rule 8 does not require plaintiffs either to use magic words or to plead legal theories; they need only "give enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). Plaintiffs' factual allegations satisfy this standard.

### III. Citi's motion to dismiss

Counts III and IV of plaintiffs' complaint both begin with the caption, "DEFENDANT CITIMORTGAGE IS LIABLE FOR THE ICFA VIOLATIONS OF ITS AGENT CENLAR THROUGH THE DOCTRINE OF RESPONDEAT SUPERIOR" ECF 1-2 at 14, 16. From the paragraphs that follow these captions, and from the brief argument plaintiffs raise in response

to Citi's motion, plaintiffs appear to claim that Citi is liable for Cenlar's alleged ICFA violations and negligence on an agency theory and/or the doctrine of respondeat superior. I agree with Citi, however, that plaintiffs' complaint contains no factual matter plausibly suggesting such liability.

"Agency is a 'fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.'" *Johnke v. Espinal-Quiroz*, No. 14-CV-6992, 2016 WL 454333, at *9 (N.D. Ill. Feb. 5, 2016) (quoting Restatement (Third) Agency § 1.01 (2006)). And the doctrine of *respondeat superior* "allows an injured party to hold a principal vicariously liable for the conduct of its agent." *McNerney v. Allamuradov*, 84 N.E.3d 437, 453 (Ill. App. Ct. 2017). A plaintiff asserting claims under either theory "must allege sufficient facts to state a plausible claim that an agency relationship existed in order to survive a motion to dismiss." *Johnke,* 2016 WL 454333, at 8. Conclusory allegations do not suffice. *Sefton v. Toyota Motor Sales U.S.A.*, No. 09 C 3787, 2010 WL 1506709, at *3 (N.D. Ill. Apr. 14, 2010) ("pleading the existence of an agency relationship requires more than a general statement that such a relationship exists."). For example, because an essential feature of an agency relationship is that the principal "controlled or had the right to

control the conduct of the alleged employee or agent," *McNerney*, 84 N.E.3d at 453, the complaint must offer some facts suggesting such control. Yet plaintiffs offer nothing in this connection. To the contrary, plaintiffs appear to assume that an agency relationship exists because Citi is allegedly "the current owner/investor of the Plaintiffs' loan." Compl. at ¶ 110. Conspicuously, their response offers no authority supporting such a theory.

IV. Conclusion

For the foregoing reasons, defendant Cenlar's motion to dismiss is denied, and defendant Citi's motion is granted.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: May 27, 2026